NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ILYA DOBRYDNEV,**
*Petitioner-Appellee,*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellant.*

---

2013-5118

---

Appeal from the United States Court of Federal Claims in No. 04-VV-1593, Judge Susan G. Braden.

---

Decided: June 19, 2014

---

MARK P. FRIEDLANDER, JR., Friedlander, Friedlander & Earman PC, of McLean, Virginia, argued for petitioner-appellee.

JOSHUA WALDMAN, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellant. With him on the brief were STUART F. DELERY, Assistant Attorney General, and MICHAEL S. RAAB, Attorney. Of counsel was HEATHER L. PEARLMAN, Attorney, Torts Branch.

———————————

Before MOORE, CLEVENGER, and O'MALLEY, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Petitioner Ilya Dobrydnev seeks relief under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 through 300aa-34, for injuries allegedly sustained following a hepatitis B vaccination. The United States Court of Federal Claims overturned the findings and conclusions of the special master and entered final judgment in favor of Ilya. *See Dobrydnev v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 134 (Fed. Cl. 2010) ("*Dobrydnev II*"); *Dobrydnev v. Sec'y of Health & Human Servs.*, 98 Fed. Cl. 190 (Fed. Cl. 2011) ("*Dobrydnev IV*"). For the reasons set forth below, we *reverse* the final judgment of the Court of Federal Claims.

### BACKGROUND

Ilya Dobrydnev alleges that a hepatitis B vaccination he received at the age of 10 on November 5, 2001 caused him to contract chronic fatigue syndrome ("CFS"). CFS is a disease characterized by "severe fatigue, orthostatic intolerance, muscle and joint pain, cognitive dysfunction, sleep disturbance, sore throat, lymph node pain, abdominal symptoms, lightheadedness, and other somatic symptoms." Report of Dr. David S. Bell 1 (Oct. 11, 2004).

### I

Ilya was born in 1991 and received a series of 3 hepatitis B vaccines between 1992 and 1993. No adverse reactions from these vaccinations were reported.

In July 1996, Ilya's mother stated on a kindergarten registration form that Ilya experienced frequent colds, sore throat, and ear infections. Between 1996 and 2000, Ilya was seen by his primary physician, Dr. Fink, approx-

imately 12 times for various complaints including fevers, sore throat, fatigue, and weakness.

In December 2000 or January 2001, Ilya contracted the Epstein-Barr virus.[1] He saw his doctors more than 10 times during the period from January 2001 to July 2001 with reports of upper respiratory infection, sore throat, fever, and severe fatigue.

In May, June, and July of 2001, Ilya visited Dr. Fink with reports of fever, white patches on his throat, and severe fatigue although, according to Dr. Fink, Ilya's mononucleosis was resolved by May. In July, Dr. Fink reported that Ilya's father has common variable immunodeficiency ("CVID"), a genetic immune disorder, and noted Ilya's mother's concern that her son might have the same disorder. Dr. Robert Fink, Medical Record of Ilya Dobrydnev (July 2, 2001). According to Dr. Fink, Mrs. Dobrydneva had shown her son's lab reports to a microbiologist who "felt that Ilya most likely did have CVID." *Id.*

In the summer of 2001, Ilya attended summer camp and participated in physical activities. In September, he took a trip to Disney World with his parents.

On November 5 2001, Ilya received a fourth hepatitis B vaccination—the vaccination at issue here. His mother testified before a special master that immediately following the vaccination he had flu-like symptoms, malaise, pallor, sore throat, and lymph-node swelling, and that he missed school on November 6 and 7. Ilya visited Dr. Kagan on November 19 with a "2–3 day history of low grade temperature elevation" and sore throat and was diagnosed with febrile illness. Dr. Harvey J. Kagan, Medical Record of Ilya Dobrydnev (Nov. 19, 2001). On

---

[1] Epstein-Barr is the virus that causes mononucleosis.

November 26 he suffered from nasal discharge and head-ache and was prescribed an antibiotic. On November 30 he was taken to the emergency room with severe dizziness and nausea and was diagnosed with vestibular neuronitis, an inner ear condition.

Ilya again visited Dr. Fink on December 10 with a sore throat and white patches on his throat and was diagnosed with tonsillitis. He visited Dr. Fink's partner, Dr. Holland, on January 2, 2002, and Ilya's mother told the doctor that he had been sick since "[t]wo weeks after" his vaccination. Dr. Jennifer M. Holland, Medical Record of Ilya Dobrydnev (Jan. 2, 2002). He visited Dr. Holland again on January 9, and the doctor reported that he appeared to be in good health. Dr. Fink noted that Ilya again generally appeared in good health on a January 14, 2002 visit, despite reported dizziness.

Ilya visited the immunologist Dr. Kelly on January 23, 2002. Dr. Kelly reported that allergies were probable but Ilya's mother refused the allergy test that would confirm this diagnosis. On February 19, Dr. Kelly report-ed that Ilya still fatigued easily although his vestibular neuronitis had improved. On February 11 and March 20, Ilya visited the infectious disease specialist Dr. Mitchell, who reported symptoms of achy legs and fatigue. Dr. Mitchell listed as a possible diagnosis "a chronic [Epstein-Barr virus]." Dr. Douglas Mitchell, Consultation Report (Mar. 20, 2002). In his recommendations, he stated his "belie[f] that there is a behavioral psychological compo-nent contributing to this continued subjective fatigue and possibly school avoidance," and noted that "[c]hronic fatigue syndrome itself may be considered in this child." *Id.* On April 1, 2002, Dr. Fink noted as possible diagnoses "[p]ossible chronic fatigue secondary to chronic [Epstein-Barr virus] or HSV [herpes simplex virus], though doubt." Dr. Robert Fink, Medical Record of Ilya Dobrydnev (Apr. 1, 2001).

In their post-hearing brief before the special master below, Ilya and his parents ("petitioners") did not cite any medical records after April 2002. Subsequent records reflect uncertainty about Ilya's medical condition, but indicate that he continued to experience weakness and fatigue. In 2010, Ilya was successfully attending university on a reduced schedule and with other accommodations for his illness.

## II

This case arises as an "off-Table" claim under the Vaccine Act. An off-Table claim is one for which causation is not presumed. For this type of claim, a petitioner bears the burden of proving by a preponderance of the evidence that his injury was caused-in-fact by a vaccine covered by the Act. 42 U.S.C. §§ 300aa-11(c)(1)(C), 300aa-13(a)(1)(A). The petitioner must prove each of three factors, known as the *Althen* factors: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination caused the injury; and (3) a proximate temporal relationship between the vaccine and the injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Ilya's parents filed an off-Table Vaccine Act claim on his behalf in October 2004. The case was referred to a special master who issued a first decision denying entitlement on March 12, 2010. *See Dobrydneva ex rel. Dobrydnev v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2010 WL 2143481 (Fed. Cl. Mar. 12, 2010) ("*Dobrydnev I*"). The special master based his rejection on the third *Althen* factor, concluding that petitioners had failed to prove by a preponderance of evidence a proximate temporal relationship between vaccination and injury. *Id.* at *18.

On July 30, 2010, the Court of Federal Claims vacated and remanded the special master's first decision denying

entitlement. *See Dobrydnev II*, 94 Fed. Cl. 134. The court overturned the special master's findings on *Althen* factor 3 and replaced them with its own findings. *Id.* at 146–48. It concluded that petitioners had met their burden with respect to this prong. On remand, the court directed the special master to issue findings and conclusions on the first and second *Althen* factors. *Id.* at 149.

In a second decision dated October 27, 2010, the special master issued findings and analysis on the first and second *Althen* factors. *See Dobrydneva ex rel. Dobrydnev v. Sec'y of Health & Human Servs.,* No. 04-1593V, 2010 WL 8106881 (Fed. Cl. Oct. 27, 2010) ("*Dobrydnev III*"). He concluded that petitioners had not met their burden with respect to either of these factors, and denied entitlement.

The Court of Federal Claims on May 9, 2011 reversed and vacated the special master's second decision and replaced it with its own findings of fact and conclusions of law. *See Dobrydnev IV*, 98 Fed. Cl. at 211–12. Based on these findings and conclusions, the court determined that petitioners had met their burden under the first two *Althen* factors. Because the court had previously concluded that petitioners had met their burden under the third *Althen* factor, it remanded to the special master for a finding of compensation due. *Id.* at 211–12. After the special master's finding in this respect, the court entered final judgment awarding petitioners $1,076,412.15. The government now appeals.

## DISCUSSION

On appeal, the government maintains that the special master was correct in his analysis of each of the three *Althen* factors. It asserts that the Court of Federal Claims erred by vacating the special master's findings and entering its own conclusion that petitioners met their burden under *Althen*.

I

Because petitioners must meet their burden under all three *Althen* factors to prevail, a failure to do so on any one of these factors is dispositive. For purposes of this appeal, therefore, we focus on *Althen* factor 2. This factor requires a petitioner to demonstrate, by preponderant evidence, "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278.

In his second decision, the special master concluded that petitioners had not met their burden under *Althen* factor 2. First, he found that petitioners had successfully eliminated from consideration two alternative causes of Ilya's condition: (1) the Epstein-Barr virus he contracted in January 2001; and (2) the infection he suffered in mid-November 2001 following his fourth hepatitis B vaccination. *Dobrydnev III*, 2010 WL 8106881, at *9–11.[2] However, the special master observed that "neither a mere showing of a proximate temporal relationship between vaccine and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Id.* at *11 (quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1323 (Fed. Cir. 2010)).

Relying on our case law, the special master noted that "treating physicians are likely to be in the best position to determine whether" the second *Althen* factor has been met. *Id.* (quoting *Capizzano v. Sec'y of Health & Human*

---

[2]  The latter finding depended on the special master's determination that the Court of Federal Claims had implicitly found in its first opinion that (1) Ilya actually had CFS; and (2) the onset of the disease happened within days of his vaccination. *Dobrydnev III*, 2010 WL 8106881, at *11.

*Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006)). Here, citing to medical records from treating physicians Fink, Fisher, and Kelly, the special master concluded that despite Ilya's family's expressed concern that the November 2001 hepatitis B vaccination had caused him to contract CFS, none of his treating physicians had ratified this theory. *Id.* at *12.

The special master acknowledged in his *Althen* factor 2 analysis that "some evidence supports the petitioners' claim," including the opinions of Drs. Oleske and Bell, petitioners' experts. *Id.* But he concluded that "this supporting evidence is outweighed by other evidence, including the opinions of Dr. Brenner [and] Dr. Wientzen," the government's experts, and the fact that no treating physician had endorsed petitioners' theory of causation. *Id.* He thus determined that the second factor had not been established. *Id.* at *12–13.

On appeal, the Court of Federal Claims concluded that the special master's findings under *Althen* factor 2 were arbitrary and capricious. *See Dobrydnev IV*, 98 Fed. Cl. at 207–11. The court determined that the special master had improperly discounted the opinions of petitioners' expert witnesses Drs. Oleske and Bell, who each opined that the November 2001 hepatitis B vaccine caused Ilya to contract CFS. *Id.* at 208–09. According to the court, the special master should have afforded more weight to Dr. Bell's opinion in particular, since he was the only expert witness to physically examine Ilya. *Id.*

The court also took issue with the special master's finding that no treating physician had ratified petitioners' theory of causation. Specifically, the court found error in the special master's failure to consider a Vaccine Event Reporting System ("VAERS") report filed by Dr. Fink on May 6, 2004. *Id.* at 208. This report included Dr. Fink's statement that Ilya suffered "an episode of vestibular

neuronitis" following his vaccination and "has had chronic fatigue since." *Id.*

Finally, the court determined that the special master had improperly failed to consider medical records demonstrating that Ilya had been ill in the days and months following the vaccine. *Id.* at 209.

The court noted its authority to correct errors of the special master when his findings of fact or conclusions of law are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 211 (citing 42 U.S.C. § 300aa-12(e)(2)(B)). Because the court had determined that the special master's findings here were arbitrary and capricious, it entered its own conclusion that "as a matter of law, Petitioners have established through medical records and medical opinion a logical sequence of cause and effect showing that a fourth, and unnecessary, hepatitis B vaccine was the reason for Petitioner's Chronic Fatigue Syndrome." *Id.*

## II

We review legal determinations of the Court of Federal Claims de novo. *Moberly*, 592 F.3d at 1321. We use the same standard used by the Court of Federal Claims—an arbitrary and capricious standard—to evaluate the special master's findings of fact. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000). Here, we conclude that the Court of Federal Claims erred by overturning the special master's findings on the second *Althen* factor, which were neither arbitrary nor capricious.

## A

In vacating the findings on *Althen* factor 2, the Court of Federal Claims concluded that the special master erred by giving insufficient weight to petitioners' experts Dr. Bell and Dr. Oleske—particularly in light of the fact that Dr. Bell was the only expert witness who physically

examined Ilya. *Dobrydnev IV*, 98 Fed. Cl. at 208–09. But the special master explicitly acknowledged that the opinions of Drs. Bell and Oleske supported petitioners' contentions. *Dobrydnev III*, 2010 WL 8106881, at *12. Nevertheless, he determined that these opinions were "outweighed by . . . the opinions of Dr. Brenner [and] Dr. Wientzen," the government's experts. *Id.*

Dr. Wientzen in particular rebutted Dr. Bell's opinion on the basis that it was premised on an incorrect assumption—that Ilya had enjoyed good health before receiving the November 2001 hepatitis B vaccination. In a 2004 letter to Dr. Fink written after his examination of the child, Dr. Bell stated that

> Ilya was in good health up until November 5th of 2001. At that time he had a hepatitis B immunization and that evening became ill with a fever. This was somewhat unusual as he had never had fever with shots before and actually rarely got fever.

Letter from Dr. David S. Bell to Dr. Robert Fink (Aug. 2, 2004).

In his report responding to Dr. Bell's opinion, Dr. Wientzen observed that "the many medical records recounting Ilya's many illnesses, evaluations and therapies antedating the events of November 2001" contradicted Dr. Bell's assumption about Ilya's health before receiving the November 2001 vaccination. Expert Report of Dr. Raoul Wientzen 1 (Feb. 21, 2005). Dr. Bell had an opportunity to address this observation in his rebuttal report, but did not do so. *See* Rebuttal Report of Dr. David S. Bell (Apr. 21, 2005).

Thus, even though Dr. Bell was the only expert witness to conduct a physical examination of Ilya, as Dr. Wientzen pointed out, this examination was conducted under a premise belied by the record—that the child had

enjoyed good health prior to the vaccination in question. Similarly, Dr. Oleske, petitioners' second expert witness, testified that Ilya was in good health prior to receiving the fourth hepatitis B vaccination.[3] As the special master correctly observed elsewhere in his second decision, "[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion." *Dobrydnev III*, 2010 WL 8106881, at *9 n.12 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

Dr. Wientzen testified for the government that there was "[a]bsolutely not" any evidence of "a good causal connection made between hepatitis B and chronic fatigue syndrome in this case." Hearing Tr. 654:25–655:5 (Apr. 26, 2007). *See also id.* at 655:11–13 ("I do not believe hepatitis B vaccine in this case had anything to do with Ilya's chronic fatigue syndrome if he were to have it."). Given the deficiencies in Dr. Bell's and Dr. Oleske's opinions and in light of Dr. Wientzen's competing report and testimony, the special master did not act arbitrarily in choosing to afford more weight to the government's experts. Nor does the fact that Dr. Bell was the only

---

[3]    For example, in response to the question: "Can you explain the standard that you used in this case to diagnose or reach a conclusion that Ilya's chronic fatigue syndrome was caused by the hepatitis-B vaccine?" Dr. Oleske testified that "prior to getting the hepatitis-B vaccine, this was a relatively healthy child . . . there were a number of visits, but nothing extremely abnormal and out of the ordinary." Hearing Tr. 1089:23–1090:1 (Sept. 29, 2010). *See also id.* at 110:22–25 ("this child was brought to the doctor, was felt to be healthy, was given a shot, and soon after developed symptoms that became chronic.").

expert to physically examine Ilya transform him into a treating physician such that increased deference to his opinion was required, particularly when this examination was performed without a full understanding of the child's medical history.[4]

B

The Court of Federal Claims also vacated the special master's finding that no treating physician had endorsed petitioners' theory of causation. According to the court, the special master erred in failing to consider the VAERS report filed by Dr. Fink in May 2004. The report stated that Ilya suffered "an episode of vestibular neuronitis" following his 2001 vaccination and "has had chronic fatigue since." *Dobrydnev IV*, 98 Fed. Cl. at 208. The court considered this report to be "highly relevant evidence" of causation that the special master should not have neglected. *Id.*

As the government points out, however, petitioners did not include the VAERS report in their original petition, and the special master may not have considered it for this reason. Appellee Rep. 14 n.3; *see* Hearing Tr. 524:8–526:9 (Apr. 26, 2007). The report was filed only after the conclusion of the hearings below, and as Dr. Fink explained, was filed at the express urging of Ilya's parents. *See* Dr. Robert Fink, Medical Record of Ilya Dobrydnev (June 16, 2003) (describing an interview with Ilya's parents and stating that "[t]here is  also concern

---

[4]    In this respect, Dr. Wientzen stated that, given the discrepancy between Dr. Bell's statements about Ilya's health prior to the November 2001 vaccination and the child's medical records, "it is apparent that [Dr. Bell] did not have the time and/or opportunity" to review these records. Expert Report of Dr. Raoul Wientzen 1 (Feb. 21, 2005).

mentioned that the additional hepatitis B vaccination that Ilya received could be related to his chronic fatigue syndrome, and they would like me to report this as a potential adverse effect.").

Further, although Dr. Fink did in fact file the VAERS report, as he himself has explicitly stated, he did not independently conclude that the 2001 hepatitis B vaccination caused Ilya to contract CFS. In a letter to the Court of Federal Claims dated July 29, 2005 in support of petitioners' claim, Dr. Fink stated that he "agree[d] with Dr. Bell's expert opinion," but explained that "since I am not an expert in this field, I deferred to the opinions of Dr. David Bell" in reaching this conclusion. Letter from Dr. Robert Fink to the United Stated Court of Federal Claims 2–3 (July 29, 2005).

Thus, to the extent that the VAERS report evidences Dr. Fink's endorsement of petitioners' theory of causation, Dr. Fink later made clear that any such endorsement resulted from a reliance on the expertise of Dr. Bell. But the special master, as explained above, found Dr. Bell's opinions unpersuasive as compared to the opinions of the government's experts. If a fact finder may reject an expert's opinion when the expert—as Dr. Bell did here—assumes facts that are not supported by the record, logic dictates that he may reject evidence from a treating physician when the physician explicitly defers to the expert whose opinion has been rejected. Even assuming, therefore, that the VAERS report was timely brought to the special master's attention, he did not act arbitrarily in failing to give it any weight.

## C

The Court of Federal Claims found further error in the special master's *Althen* factor 2 findings because the special master allegedly ignored "unchallenged medical records" showing that Ilya had been ill in the days and months after the 2001 vaccination. *Dobrydnev IV*, 98 Fed.

Cl. at 209. The facts cited by the court in this regard are the same facts used by the court in its first opinion to establish a proximate temporal relationship under *Althen* factor 3. *Compare id.* (citing medical and school records demonstrating Ilya's illnesses  and absences from school in November 2001 through March 2002), *with Dobrydnev II*, 94 Fed. Cl. at 146 (citing the same records in support of its conclusion that petitioners had established a proximate temporal relationship under *Althen* factor 3).

The court is correct that "evidence used to satisfy one of the *Althen* . . . prongs can[] overlap to satisfy another prong." *Dobrydnev IV*, 98 Fed. Cl. at 209 (quoting *Capizzano*, 440 F.3d at 1326). But the court erred in finding that the special master ignored this evidence. To the contrary, the special master explicitly considered this evidence and found it outweighed by other evidence. He stated:

> It is certainly the case that some evidence supports the petitioners' claim, including the evidence relied upon by the Court in finding that there was a proximate temporal relationship between Ilya's vaccination and the onset of his chronic fatigue syndrome. . . . Nevertheless, this supporting evidence is outweighed by other evidence, including the opinions of Dr. Brenner [and] Dr. Wientzen . . . .

*Dobrydnev III*, 2010 WL 8106881, at *12.

The Court of Federal Claims, in the first instance, might have weighed this evidence differently from the special master. But under an arbitrary and capricious standard of review, the court may not reweigh the evidence if the special master has "considered the relevant evidence of record, drawn plausible inferences, and articulated a rational basis for [his] decision." *Hazlehurst v. Sec'y of Health & Human Servs.*, 604 F.3d 1343, 1349 (Fed. Cir. 2010). The special master has done so here, and

the Court of Federal Claims erred in vacating his findings.

## CONCLUSION

The Court of Federal Claims erred by vacating the special master's findings under *Althen* factor 2. Because these findings demonstrate that petitioners have not met their burden under this factor, the final judgment of the Court of Federal Claims in favor of petitioners is reversed.

## **REVERSED**

## COSTS

Each side shall bear its own costs.